**EXHIBIT A**

| | |
|---|---|
| State of Illinois | ) |
|  | ) ss |
| County of St. Clair | ) |

**UNSWORN DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF COMPLAINT FOR FORFEITURE**

I, Larry Brantley, do hereby depose and declare under penalty of perjury the following:

At all times relevant herein, I have been a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). The contents of this Declaration are based on information provided to me during the course of my investigation from participants in the criminal activity, from other witnesses, and from other law enforcement officers.

1. On May 31, 2018, TFO Kyle Waddington (TFO Waddington), TFO Michael Reichert (TFO Reichert), and, declarant, TFO Larry Brantley (TFO Brantley) conducted a traffic stop on a gray Ford Forest River Forester Recreational Vehicle (RV) bearing an Arizona registration for improper lane usage and failure to signal on Interstate 70 west bound at mile marker 18 in Madison County, Illinois. As the TFOs were traveling west bound on Interstate 70, they witnessed the RV change lanes without signaling in front of their patrol vehicle. The TFOs initiated a traffic stop and queried the vehicle's license through law enforcement databases. The RV returned registered to Patrick Neil Barber of Sedona, Arizona.

2. TFO Brantley approached the passenger side door of the RV and made contact with the driver. TFO Brantley informed the driver of the reason for the traffic stop and requested his driver's license. The Arizona driver's license provided by the driver identified him as Patrick Neil BARBER. TFO Brantley briefly spoke with BARBER about his recent travels. BARBER told TFO Brantley that he was a musician and had been recording a new record in Nashville, Tennessee

for the past "couple of weeks." BARBER told TFO Brantley that he was driving from Nashville, Tennessee to his home in Sedona, Arizona to attend a graduation ceremony. As TFO spoke with BARBER, BARBER seemed unwilling to answer questions regarding his travels by attempting to steer the conversation from his recent travels to talking more about his music career. TFO Brantley did not smell the odor of cologne coming from the RV during this encounter.

3. Because BARBER was trying to control the conversation, TFO Brantley thought that for some reason BARBER did not want to advise officers about his travels. TFO Brantley noticed that BARBER was almost rambling on about his music career, but was not as forthcoming about his travels. TFOs have experienced this in the past when drugs and/or large amounts of currency were located in a vehicle. The subjects would steer the TFOs conversation from the questions the TFOs were asking to conversations which were not pertinent to the vehicle stop.

4. TFO Brantley returned to the patrol vehicle with BARBER's information and queried BARBER through law enforcement databases. TFO Brantley learned that BARBER had a criminal history from Los Angeles, California for Prostitution in 1973.

5. Believing that BARBER was going to be untruthful about his travels in the RV, based on TFO Brantley's conversation with BARBER, TFO Brantley queried the license plates on Barber's RV through a license plate reader (LPR) database. The returned response showed BARBER's RV traveling eastbound in Holbrook, Arizona on May 23, 2018, at 21:32 hours Mountain Standard Time (MST). The oldest sighting listed was on May 18, 2018, at 09:58 hours Pacific Daylight Time (PDT) and showed BARBER's RV traveling westbound in Needles, California. These LPR responses showed a vehicle that matched the description of the RV BARBER was currently driving.

2

6. TFO Brantley informed TFO Waddington and TFO Reichert about BARBER's statements regarding his current trip. The TFOs found BARBER's path from Tennessee to Arizona odd since where they stopped BARBER seemed to be north of the most direct route to Arizona. An internet search was conducted for the quickest and most direct routes from Nashville, Tennessee to Sedona, Arizona. TFOs discovered that these routes would not go through Illinois. Due to the LPR responses, TFO Brantley's conversation with BARBER and the odd route taken by BARBER to Arizona, the TFOs believed it was necessary to gather additional information on BARBER.

7. As TFO Waddington completed the written warning, TFO Brantley re-approached the passenger's side of the RV to speak with BARBER and to obtain his registration and insurance information. BARBER provided the information and began to speak with TFO Brantley. TFO Brantley asked BARBER what dates he was in Nashville, Tennessee and BARBER responded that he was in Nashville, Tennessee for ten days. TFO Brantley asked BARBER if he knew the date he left Arizona. BARBER appeared agitated with the specific question and responded, "Well, why does that matter?" TFO Brantley believed that BARBER was being evasive and untruthful concerning his trip to Nashville, and the time-line he gave. In an attempt to change the conversation, as BARBER previously did with TFO Brantley, BARBER directed the conversation to his music album and handed TFO Brantley a Compact Disk (CD) of his album, entitled "Songs from the Bus of Love" and released in 2015. BARBER told TFO Brantley that he hands the CDs out for free. BARBER explained the CDs only cost him one dollar per CD. BARBER told TFO Brantley that he was going to a graduation in Sedona, Arizona on Saturday (June 2, 2018) and would return to Nashville, Tennessee to record more music afterwards. TFO Brantley still did not

smell the odor of cologne coming from the RV.

8. TFO Brantley returned to the patrol vehicle and informed TFO Waddington and TFO Reichert about the additional statements made by BARBER. TFO Brantley showed the TFOs the CD from BARBER and informed them that BARBER stated he had been in Nashville, Tennessee for the last ten days. BARBER claimed he left Nashville, Tennessee on May 30, 2018, and had arrived there ten days earlier on May 20, 2018. These statements were not consistent with the information provided by the LPR database, which showed BARBER's RV traveling eastbound in Holbrook, Arizona on May 22, 2018. Since the LPR reader did not capture the driver of the RV, TFO Brantley asked BARBER if anyone else drives the RV and BARBER responded "No."

9. Based on the odd route BARBER was traveling, according to the itinerary BARBER provided; BARBER's initial reluctance to provide TFOs with his itinerary; and the fact that BARBER's RV was spotted in Holbrook, Arizona while BARBER stated he was in Nashville, Tennessee, the TFOs believed that BARBER was being deceitful and could be involved in criminal activity.

10. TFO Brantley returned to the passenger side window of BARBER's RV to issue him the warning for the traffic violations and to ask him about his suspicious behavior. Before TFO Brantley could confront BARBER, BARBER asked TFO Brantley if he (BARBER) looked like a terrorist. BARBER began asking TFO Brantley questions regarding the stop and said he was in a hurry to get back to Arizona. TFO Brantley asked BARBER if there was anything illegal inside of the RV. BARBER said no. TFO Brantley asked BARBER more specific questions about contraband inside the vehicle. Specifically, TFO Brantley asked BARBER if there was any marihuana, cocaine, methamphetamines, or heroin inside the vehicle. BARBER denied having any

4

of the listed drugs inside the RV and answered all of the questions the same way while making eye contact with TFO Brantley. TFO Brantley then asked BARBER if there were any large amounts of United States currency inside the vehicle. BARBER hesitated and broke eye contact with TFO Brantley, and then said that he had a few thousand dollars in the RV.

11. BARBER continued answering TFO Brantley's question by offering a reason for having a few thousand dollars in the RV. BARBER pointed to his box of CDs on the passenger side seat and said the money was profits from travelling around and selling his CDs. TFO Brantley recalled that BARBER had earlier told TFO Brantley that he (BARBER) gives the CDs away for free and that he pays very little for the CDs. TFO Brantley asked BARBER for consent to search the RV. BARBER denied consent to search. TFO Brantley advised BARBER that he was free to leave; however, the RV could not be moved while this investigation was being conducted. TFO Brantley further advised BARBER that a K9 was en route to their location. BARBER advised TFO Brantley that he would wait. TFO Brantley still did not smell the odor of cologne coming from the RV. TFO returned to the patrol vehicle and waited for the K9 Unit to arrive.

12. Patrolman Tony Raciak (Patrolman Raciak) of the Troy (Illinois) Police Department arrived on scene with his K9 partner, Zak. Upon arrival, Patrolman Raciak requested that TFOs ask the driver of the RV (BARBER) to roll up the windows and to exit the RV so that the K9 could be deployed. TFO Brantley re-approached the RV (to request that BARBER to roll up the windows) and found that all of the windows had been closed. While TFO Brantley was at the passenger's side window, he tapped on the window to speak with BARBER and to ask BARBER to step out of the RV. When BARBER partially opened the window, TFO Brantley could now smell the strong odor of cologne or fragrance coming from inside of the RV. The odor was

5

overwhelming as if BARBER had just spraying the cologne and it had not had time to dissipate in the air. After BARBER exited the driver's side of the RV, TFO Brantley (who was at the passenger's side of the RV) met BARBER around the back of the RV. TFO Brantley did not recall smelling the cologne on BARBER's person. TFOs have seen this tactic used before when they have seized drugs and/or currency from subjects. The subjects will introduce a masking agent, in this case cologne, in an attempt to thwart the K9's ability to smell the odor of narcotics.

13. Patrolman Raciak deployed his K9 around the RV. While Patrolman Raciak and his K9 were deployed, BARBER stood near the front of the patrol vehicle with TFO Reichert. As the K9 walked around the RV, BARBER appeared to be very nervous and the TFOs observed BARBER blinking his eyes, sweating and looking at the RV then looking away in another direction, only then to look back at the RV. BARBER told TFO Reichert, "I have a turd sticking out of my ass." TFO Reichert asked BARBER to repeat the statement, and BARBER said, "I have a turd sticking out of my ass." Shortly after BARBER made these statements to TFO Reichert, Patrolman Raciak advised that his K9 had positively alerted to the presence of narcotics near the rear passenger's side living-quarters entry door. Raciak then placed his K9 back into his patrol vehicle.

14. Based on the K9's alert, TFO Brantley, TFO Waddington and TFO Reichert began searching the RV while Patrolman Raciak stood with BARBER. TFO Brantley entered the rear living quarters of the RV and noticed that the bed appeared to be suspiciously high off the floor and did not appear to be factory made. The bed appeared so high that it seemed that BARBER would have a hard time climbing into the bed. TFO Brantley raised the mattress of the bed and located a 3-digit combination lock. The lock was attached to a steel fixed clasp mounted on a plywood bed frame that did not appear to be factory made. BARBER provided TFOs with the combination to

the lock.

15. Once the TFOs removed the lock, the plywood bed frame was raised to reveal a guitar case and other miscellaneous items, to include musical equipment, located inside of the box. TFOs removed these items and located another bed frame, which appeared to be factory installed. The TFOs raised the second portion of the bed frame and located a small box built into the natural voids of the RV. A closer look at the box revealed tool marks on the screw heads making it appear that the screws had been removed and screwed back into place numerous times.

16. TFOs retrieved a drill, removed the screws from the box, and located multiple vacuum-sealed packages of what appeared to be United States currency wrapped in aluminum foil. TFOs noticed that one of the vacuum-sealed packages had "$103,950" written on the clear packaging. TFOs also located what appeared to be a bundle of currency wrapped in aluminum foil in the freezer portion of the refrigerator and another bundle of United States currency (not wrapped in aluminum foil) in a sock drawer under the bed on the driver's side of the RV. TFO Brantley also located a black Ruger LCP .380 handgun in a sock drawer under the bed on the passenger side of the RV. At that time, a decision was made to leave everything in its place and to move the RV and BARBER to the Pontoon Beach Police Department in order to complete a more thorough search.

17. TFO Kevin Thebeau (TFO Thebeau) and TFO Jason Wolf (TFO Wolf) assisted in the search at the Pontoon Beach Police Department where they located a well-defined marihuana drug ledger in a brown box. This box was originally located under the first bed frame that was installed after market. The ledger was in spreadsheet format, but included handwritten notes on separate pages. The drug ledger listed different strains of marihuana, the corresponding weight and

cost of each particular strain. The ledger also seemed to include the total amount of profit made from the sale of marihuana after the drug was sold.

18. TFO Thebeau and TFO Wolf also located ten extra-large AWOL (All Weather Odor Locking) duffel bags in the rear of the RV against the back wall underneath the bed. An internet search was conducted which showed that the AWOL bags are advertised as a way to conceal the odor of marihuana.

19. Once the search was completed, TFO Thebeau and TFO Wolf put on latex gloves, took a representative sample of the United States currency, and then placed these samples into a clean unused Pontoon Beach Police Department paper evidence bag. The remaining three bags contained camera-recording equipment, used to weigh the bags down. The bags were closed and placed in the sally port of the Pontoon Beach Police Department so that the K9 could be deployed.

20. Once the bags were placed in the sally port, Patrolman Raciak and his K9 were asked to enter the sally port and conduct a K9 sniff. Patrolman Raciak allowed his K9 to do an off-leash deployment. The K9 alerted and gave a positive indication for narcotics on the bag containing the United States currency.

21. TFOs attempted to interview BARBER, however BARBER invoked his rights to have an attorney present and the interview was concluded. BARBER was released, along with his personal belongings, pending further investigation. TFO Brantley and TFO Waddington escorted BARBER to the lobby of the Pontoon Beach Police Department. Before TFO Brantley left the Pontoon Beach Police Department, BARBER stopped TFO Brantley and asked to speak with him in the front lobby of the police department. BARBER was standing with several of the AWOL duffel bags and informed TFO Brantley that he (BARBER) uses the AWOL duffel bags to transport

marihuana strain t-shirts. BARBER said he did not have any t-shirts with him, nor did he know the exact cost of the t-shirts. TFO Brantley asked BARBER where his t-shirts are printed and BARBER stated that he has a place do it but he could not remember the name. TFO Brantley asked BARBER why the bags were secured with combination locks and BARBER replied, "I'm going to talk to my accountant about it." TFO Brantley then walked away from BARBER ending the conversation.

22. The United States currency was transported to LOOMIS so that an official count could be conducted. The seized currency totaled $510,910.00. During the official count, LOOMIS personnel discovered several paper money bands binding some of the currency together. The bands had the name of CRESOM Bank, with an address in North Carolina. An internet search revealed that CRESOM banks are located in North and South Carolina. This information is not consistent with BARBER's stated travel itinerary of traveling from Nashville, Tennessee to Sedona, Arizona.

23. Based on the foregoing, declarant believes that the subject-matter $510,910.00 in United States Currency is property which constitutes money furnished or intended to be furnished by a person in exchange for a controlled substance, or proceeds traceable to such an exchange, or money used to facilitate a violation of 21 U.S.C. § 801 *et seq.*

24. Declarant believes, as a result of the foregoing, that BARBER used the Ford Forest River Forester Recreational Vehicle, VIN: 1FDWS9PM1GKA97463, to haul controlled substances as well as proceeds of the sale of said controlled substances, in order to facilitate the sale of controlled substances.

25. Declarant further believes that the Ford Forest River Forester Recreational Vehicle,

VIN: 1FDWS9PM1GKA97463, with all accessories, attachments and components thereon, constitutes a conveyance which was used or intended to be used, to transport, or in any manner to facilitate the transportation, sale, receipt, possession or concealment of a controlled substance, and is thus subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(4).

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 4th day of September, 2018.

_____
LARRY BRANTLEY
Task Force Officer
Drug Enforcement Administration